## The Toledo and Wabash Railway Company *v.* Goddard.

Negligence—Res Gestæ.—Suit against a railway company for damages caused by running a train of cars over the plaintiff's wagon and horses, while they were being driven by the plaintiff's servant along a public highway.

*Held,* that if the servant contributed by his negligence to the accident, the plaintiff could not recover.

*Held,* also, that the statements made by the servant at the time, as to the cause of the accident, were a part of the *res gestæ,* and admissible in evidence against the plaintiff.

Practice.—Where the court below refuses to permit a question to be answered by a witness, the particular facts expected to be elicited must be shown, in order that this court may judge of their materiality. If this is not done, the error is not available.

Special Findings.—The court, at the request of the plaintiff, submitted to the jury the following interrogatories: 1st. "Was not the defendant guilty of negligence in placing the freight car on the side track on the street, thereby obstructing the same? 2d. Was not the defendant guilty of negligence in not placing some visible signal to indicate the approach of the backing train?" To each of which questions the jury answered, "Yes."

*Held,* that the interrogatories were not within the statute, and should not have been submitted to the jury, because they do not ask a finding on any particular matters of fact, but, assuming certain facts, ask the jury to pronounce upon the question of negligence, as a conclusion of law from the facts assumed.

Practice—Reversal.—The general rule is, that if there was evidence from which the jury might reasonably have found a fact, this court will not disturb the verdict, because there was other evidence in conflict with that

on which the finding was based. But where the evidence in support of the finding is clearly and conclusively contradicted, this court will not hesitate to reverse the case.

RAILROADS—ORDINARY CARE.—Where the engineer of a train of cars sounds the whistle and rings the bell, and runs the train at a reasonable speed in approaching a crossing, he exercises reasonable and ordinary diligence, which is all the law requires.

RAILROADS—HIGHWAYS.—The rights and duties of a railroad company, and of persons traveling on a public highway which crosses the track of the railroad, are mutual. Both have the right to pass, and both are bound to use ordinary care and diligence to avoid injury.

ORDINARY CARE.—Ordinary care is that degree of care which a person of ordinary prudence is presumed to use, under the particular circumstances, to avoid injury, and should be in proportion to the danger to be avoided, and the fatal consequences involved in its neglect.

MUTUAL NEGLIGENCE.—The party complaining of an injury caused by the negligence of another, cannot recover if it appears that by the want of ordinary care and prudence on his part he contributed directly to the injury. Where negligence is the issue, it must be a case of unmixed negligence to justify a recovery.

APPEAL from the *Wells* Circuit Court.

ELLIOTT, J.—This was a suit by *Goddard*, against the railroad company, before a justice of the peace of *Allen* county, for injuries to the wagon and horses of the former, caused by the cars of the latter, at a point where a street or public highway crossed the track of the railway, by the alleged carelessness of the servants and agents of the railway company.

The carelessness and wrongful acts complained of are, that the agents and employees of the railway company caused the plank road, or highway, on which the plaintiff's agent and team were passing across the track of the railway, "to be wrongfully and unlawfully obstructed, by placing freight cars thereon, and obstructing the track of said road from the view of the people, and especially from the view of the agent of the plaintiff, when about to drive said horses and wagon across said railway track, on said street. And that said employees and agents of the defendant, at the time aforesaid, were running a locomotive and train of cars on said railroad, through the city of *Fort Wayne*,

carelessly and negligently; and while being so carelessly and negligently run as aforesaid, and without giving the necessary and proper alarm, crossed said street and highway, and then and there wrongfully ran against, over and upon the said wagon, horses and harness of the plaintiff," and thereby greatly injured them, &c.

The defendant answered:

1st. A general denial.

2d. "That the defendant's gravel train was backing up in the usual way, at a moderate speed, to get out of the way of the regular train, when the plaintiff's team was carelessly, negligently and recklessly driven into the defendant's said gravel train, and thereby, without the fault or negligence of the defendant, and by the negligence and recklessness of the driver of the plaintiff's team, the said accident complained of occurred." There was a replication in denial of the second answer.

The justice of the peace, on the hearing of the cause, rendered a judgment for the plaintiff. The defendant appealed to the *Allen* Circuit Court, and the cause was afterward transferred, on change of venue, to the *Wells* Circuit Court. In the latter court there was a trial by jury, and a verdict for the plaintiff. Motion for a new trial overruled, and judgment on the verdict. The evidence is all in the record, of which a plat of the locality of the accident, and of the surroundings, is made a part.

By the plat, and other evidence explanatory thereof, and of the facts and circumstances connected with the injury complained of, it appears that the accident occurred on the south side of the city of *Fort Wayne*, where the plank road, (the extension of *Lafayette* street,) crosses the railroad tracks. The course of the plank road is nearly due north and south, and the tracks of the *Pittsburgh, Fort Wayne and Chicago Railroad*, and of the *Toledo and Wabash Railroad*, both running east and west, cross the plank road at nearly right angles.

The *Wabash* road is south of the *Chicago* road, and has

two tracks crossing the plank road about eight feet apart. The north track of the *Wabash* road is about twenty-five feet south of the south track of the *Chicago* road. Between the tracks of the two railroads, on the east of the plank road, the *Pittsburgh, Fort Wayne and Chicago Company* have a wood-shed 200 feet long, east and west, and twenty feet wide. The west end, or rather the south-west corner of this wood-shed, at the time of the accident, extended a little into the east line of the plank road. The latter railroad had five tracks on the west side of the plank road, and extending across it. Three of these tracks unite in one, on the east line of the plank road, and this track, so formed by the union of the three, extends east along and within four or five feet of the north side of the wood-shed. The north track of the *Wabash* road runs within four or five feet of the south side of the wood-shed. On this track, at the time of the accident, a box car of the *Wabash* road was standing, south of the wood-shed, but the west end of it projected two or three feet further into the line of the plank road than the wood-shed. Another box car was also standing on the same track, on the west side of the plank road, but the east end of it was several feet west of the west line of the plank road. The latter road was planked probably twelve feet wide, and the box car on the east side was two or three feet east of the east line of the planking.

*Goddard* lived south of *Fort Wayne*, and was engaged in hauling wood over the plank road to the city. His team, for months, had been driven by a hired hand by the name of *Gilpin*, who had driven it almost daily over the same crossing, and was familiar with the locality. The accident occurred between two and three o'clock in the afternoon of the 4th of *January*, 1862, and about the time the regular passenger train on the railroad, going west, was due at that place. *Gilpin* had been to the city, and was returning home with *Goddard's* team when the accident occurred. Two other persons, *Gerrard* and *Robuck*, were in the wagon, but *Gilpin* was driving.

The Toledo and Wabash Railway Company *v.* Goddard.

As *Gilpin* approached the track of the *Chicago* road with the team, a locomotive on one of the tracks of that road, with its bell ringing and making the usual noise, was about to cross the plank road; *Gilpin* increased his speed, thinking to pass before the locomotive, but the latter passed the crossing before him, and within ten or fifteen feet of the horses heads. While the engine was passing, the horses were somewhat excited. They were then, at most within three or four rods of the track where the accident occurred, but *Gilpin* drove on at a rate of speed, as *Gerrard*, *Goddard's* witness, testifies, of six miles an hour until the collision occurred.

The gravel train on the *Wabash* road was backing in from the east, on the south track of that road, as was usual at that time of day, to clear the main track for the passenger train. The wood-shed of the *Chicago* road prevented *Gilpin* from seeing the gravel train thus backing in, and for the same reason the engineer of that train could not see the team approaching the crossing until the horses passed the wood-shed and were within a few feet of the track, and the collision occurred almost instantly afterward. As soon as the engineer discovered the team, he whistled the brakes down and stopped the train as soon as they could be applied, almost instantly. The bell of the engine was ringing while the train was backing in. The plaintiff's witnesses testified that the train came down before the horses, and the horses turned to the west, and the second or third car struck the near hind wheel of the wagon and knocked one of the horses under the box car standing on the north track of the railroad, west of the plank road. While the witnesses for the defendant testify that the tongue of the wagon first struck the side of the *third* car, and made a distinct mark on it; that the force and impetus of the cars turned the horses and wagon west, and brought the wagon in contact with the car. It is not, perhaps, very material whether the cars ran against the wagon, or the wagon the cars. One fact, however, is quite

evident: the cars were passing on the track across the plank road, and had first reached the crossing, as one, if not two of them, had passed the crossing before the collision occurred, and if the team had remained in the same position it occupied when the first car passed, no collision could have taken place. The team was north of the railroad track when the first car passed, and hence there was no collision with that car; the other cars passed on the same track, and were not further north than the first, and, therefore, if the team had not advanced to the south after the first car passed the crossing, no collision could have occurred. The team,. therefore, was run against the train, and not the train against the team.

*Gilpin* did not stop the team, or even slacken his speed, for the purpose of ascertaining if the track was clear, before approaching or attempting to go on it; nor is there any evidence that he used any of his senses, or any precaution whatever, to ascertain whether a train was approaching.

During the progress of the trial, the defendant having first proved that *Gilpin* was the driver of *Goddard's* team at the time of the accident, asked a competent witness, then on the stand, this question: " What conversation, if any, had you with the said *Gilpin*, the driver of the plaintiff's team, at the time of the accident, and in relation to it?" The plaintiff objected to the question, on the ground that the statements of the driver were not a part of the *res gestœ*, and the court sustained the objection and refused to allow the witness to answer the question, to which the defendant excepted. And this is the first question presented by the record.

*Gilpin* was the servant and agent of *Goddard* in driving his team, and if he contributed to the accident by his own negligence, or by failing to exercise ordinary care to prevent it, *Goddard* would have to suffer the consequences, and could not recover. Driving the team was the business of *Gilpin's* agency, and it was his duty to use ordinary care to prevent injury, and if immediately upon the occur-

rence of the accident, he made statements in reference to it, as to how it happened, such statements would constitute a part of the *res gestœ*, and should have gone to the jury. *Doe, &c.,* v. *Reagan,* 5 Blackf. 217; *Strange* v. *Donahue,* 4 Ind. 327; 1 Greenl. § 108; *Rex* v. *Foster,* 25 Eng. C. L. 421; *The State* v. *Powell,* 2 Halst. 244.

It is not shown, however, what particular fact was expected to be elicited from the answer of the witness, by which the materiality of the evidence would be shown. This, we think, should have been done; and in the absence of such showing, we cannot say that the defendant below was injured by the refusal of the court to admit the evidence, and therefore should not reverse the judgment because of such refusal.

To justify the finding of the jury in favor of the plaintiff, they must have found that the injury was caused by the negligence of the agents and employees of the railroad company, as alleged in the complaint, and it is insisted by the appellant that the evidence in the case does not sustain the finding.

The court, at the request of the plaintiff, submitted to the jury the following special interrogatories, to which they returned the answers annexed.

" Was not the defendant guilty of negligence in placing the freight car on the side track, on the street, thereby obstructing the same?" To which the jury answered, "Yes."

"Was not the defendant guilty of negligence in not placing some visible signal at or near the south-west corner of the wood-shed, to indicate the approach of the backing train, to prevent collision?" To which the jury answered, "Yes."

These interrogatories, we think, should not have been submitted to the jury. The answers to them do not constitute a special verdict under the statute. They were probably intended to be submitted under the last clause of sec. 336 of the code, 2 G. & H. 205, which provides that the court, "in all cases when requested by either party, shall

instruct the jury, if they render a general verdict, to find specially, upon particular *questions of fact*, to be stated in writing, which special finding is to be recorded with the verdict. These interrogatories do not conform to the statute. They do not ask the jury to find upon any particular questions of fact; they simply assume that certain facts existed, and ask the jury if they do not constitute negligence.

The question of negligence is ordinarily a mixed one of law and fact, but when the facts are found, then their legal consequences constitute purely a question of law for the court, and not for the jury. If the jury had been asked to find specially whether the defendant had placed a freight car on the side track on the street, thereby obstructing the same; and whether the company had placed a visible signal at or near the south-west corner of the wood-shed, to indicate the approach of the backing train, to prevent collision, and the jury had answered the first in the affirmative, and the second in the negative, these would have been facts specially found by the jury, and then it would have devolved upon the court to determine, as a question of law, whether the facts so found by the jury constituted such negligence as to make the defendant liable for the injury complained of.

No exceptions were taken to the interrogatories in the court below, but as no facts are found by the answers, they can have no influence in sustaining the general verdict of the jury.

We have seen that the car on the side track west of the plank road was not on the highway, and, as the train approached from the east, it could not have obstructed the view. The car on the east side of the plank road projected a few feet into the highway, but it is unreasonable, if not impossible, to ascribe the accident to its presence there. It was almost entirely hid from view by the wood shed on the *Chicago* road, and if the car had not been there, the evidence is clear that the view of the approaching train would

The Toledo and Wabash Railway Company v. Goddard.

still have been obstructed by the wood-shed. But the jury find the defendant guilty of negligence in not placing some visible signal at or near the south-west corner of the wood-shed, to indicate the approach of the gravel train. The train was on the railway track, and as it approached the crossing the usual signal in such cases was given, by ringing the bell of the locomotive, and if *Gilpin* did not hear it, it was *Goddard's* misfortune, but not the fault of the defendant. We know of no rule of law that would require the railroad company to place "some visible signal" at a given point to indicate the approach of the train to a crossing.

The only question presented by the record, even tending to show negligence on the part of the employees of the railroad company, which could have caused or contributed to the injury, is as to the rate of speed of the train in approaching the crossing. The law does not determine how fast a train may run in crossing a public highway. It is a question of ordinary care and prudence, and must depend upon all the surroundings. A rate of speed amounting to gross negligence in running a train across a street in the crowded part of a city, where many persons and teams are constantly passing and repassing, might not show any want of care and prudence in crossing a highway in open view and but little used. Here the record does not show the surroundings bearing on this point.

At the instance of the defendant, the court required the jury to find specially in answer to the following interrogatory, viz:

"Did the gravel train back up at a greater rate of speed than four miles per hour?" To which the jury answered, "Yes." The jury also found specially that the bell of the engine of the gravel train was rung as the train was backing.

It will be observed that though the jury found that the train backed up at a greater rate of speed than four miles per hour, they did not find at what rate it did back up.

VOL. XXV.—13.

The appellant insists that this finding is not supported by the evidence. The following is all the evidence given to the jury on that point:

*Gerrard*, who was in the wagon, testifies: "I should judge the train was going at the rate of eight or ten miles an hour."

*Newman* testifies that he was present, saw the train backing in, and saw the collision. "The train was backing at a speed not exceeding four miles an hour." This witness further testifies that when the brakes were applied "the train stopped instantly. The fourth car was on the road when the train stopped, and nearly across the street."

*William Jones* testifies that he heard the train coming down, heard the whistle, and afterward the bell ringing. The train was making a great noise; heard the whistle above, "and saw the train coming down slow." * * "From the noise the train made, I should judge that it was backing in at a speed of from two and a half to three miles per hour."

*Gerrard* was unskilled in judging of the speed of trains. He was in the wagon, and did not see the train until almost at the instant the collision occurred, and then, from his own perilous situation, it is but reasonable to presume that his mind and attention were directed immediately to the horses and wagon, and the means of escape from imminent peril.

*Newman* and *Jones* were accustomed to judge of the speed of moving trains, not only by sight, but by the noise made by them and the stroke of the engine. The former was an employee of the defendant, and the latter of the *Fort Wayne and Chicago Company.* They both heard and saw the train backing in before it reached the crossing. Their attention was directed to the train. They were therefore better qualified to judge of the speed, and their opportunities of judging accurately were far superior to those of *Gerrard.* But the fact testified to by *Newman,* and which is not contradicted, that the train was stopped instantly, when the brakes were applied, seems conclusive

of the fact that it could not have been moving at the rate of eight or ten miles per hour,. The collision occurred with the second or third car, the brakes were applied at that time, and when the train stopped the fourth car stood across the plank road. We do not ignore the rule so repeatedly laid down by this court, that we will not reverse a cause upon the mere weight of evidence. The general rule is that if there is evidence from which the jury might reasonably find or infer a fact, and they find accordingly, this court will not disturb the verdict because there is other evidence in conflict with that on which the finding is based. But where the evidence in support of the finding is clearly and overwhelmingly, or conclusively contradicted, it would be a reproach to the law, and a flagrant outrage upon the rights of parties to refuse to disturb the verdict, simply because it had been found by a jury.

Here, however, it is evident from the record that the finding of the jury is based alone upon the alleged carelessness of the defendant in leaving the box car on the side track, and in the failure to place "some visible signal at or near the corner of the wood shed, to indicate the approach of the gravel train, or otherwise notify *Gilpin* of its approach, and not because the train was moving at an improper speed. The complaint contains a general allegation of carelessness in running the train, but there is no specific charge that it was run at an improper rate of speed. No instruction to the jury in reference to the speed of the train was asked by the plaintiff, or given by the court, nor did the plaintiff ask any special finding on that subject.

The following instruction, excepted to by the defendant, was asked by the plaintiff, and given by the court: "If the driver of the plaintiff's team did not hear the bell or whistle, and it could not have been heard by a man of ordinary capacity and care, owing to the ringing of the bell on the *Pittsburgh* road, a few feet behind him, and he could not see the train backing in on the *Wabash* road, on account of the

*Pittsburgh* shed, and he was using proper care in driving said team, he was not guilty of negligence, and was not compelled to stop his team to inquire, it being the duty of the railroad company to give to all persons passing over the road at a crossing reasonable notice of the coming train, and if the engineer failed in giving such notice it was gross carelessness, and if loss ensued the railway is liable." The verdict of the jury was probably based on this instruction, which is clearly not the law, and cannot be sustained upon any hypothesis of right or reason. It assumes that the whistle of the locomotive of the gravel train was sounded, and the bell properly rung, and that the train was moving at a proper rate of speed, yet because *Gilpin* could not hear the whistle or bell, owing to the ringing of the bell on the *Pittsburgh* road, immediately behind him, and could not see the gravel train because of the *Pittsburgh* wood-shed, it was the duty of the engineer to give some kind of special notice of the approach of the train, and instructs the jury that his failure to do so was gross negligence.

It holds the *Wabash* road responsible that the engineer on the gravel train, with his own bell ringing in his ears, should hear the bell on the *Pittsburgh* road, and know that its noise prevented persons passing down the plank road to the crossing from hearing his own bell or whistle, and thereby imposed on him the necessity of giving all such passers special notice of the approach of his train, before going upon the crossing. If the engineer sounded the whistle and rang the bell, and approached the crossing at a reasonable speed, these were all the means of notice within his power; they constituted reasonable and ordinary diligence, and were all the law requires   *Runyen* v. *The Central R. R. Co.*, 1 Dutcher 558; *Mackey* v. *The New York Central R. R. Co.*, 27 Barb. 528.

The instruction is remarkable in another respect. While it is so extremely rigid as to the requirements of the railroad company to avoid injuries, it says to the jury, that if *Gilpin* could not see the gravel train because of the wood

The Toledo and Wabash Railway Company *v.* Goddard.

shed, and could not hear its whistle or bell, owing to the ringing of the bell behind him, and he was using proper care in driving his team, he was not compelled to stop and inquire, or use other precautions, but was at liberty to drive forward upon the crossing without being guilty of negligence, because it was the duty of the railroad company to give him actual notice of the approach of the train.

The rights and duties of a railroad company, and of persons traveling on a public highway crossing the track of the railroad, are mutual. Both have the right to pass, and both are bound to use ordinary care and diligence, in doing so, to avoid injury. Ordinary care is that degree of care which a person of ordinary prudence is presumed to use, under the particular circumstances, to avoid injury. It must be in proportion to the danger to be avoided, and the fatal consequences involved in its neglect.

It is the well settled doctrine of the law, that a plaintiff cannot recover in such a case, if it appears that by the want of ordinary care or prudence on his part he directly contributed to the injury, or in other words, if by the exercise of ordinary care and prudence he might have avoided the injury. Where negligence is the issue, it must be a case of unmixed negligence to justify a recovery; and if both parties, by their negligence, immediately contributed to produce the injury, neither can recover. These positions are sustained by the following authorities: *Butterfield* v. *Forester,* 11 East 60; *The Evansville, &c., R. R. Co.* v. *Hiatt,* 17 Ind. 102; *Loften* v. *Vogles, id.* 106; *The Evansville, &c., R. R. Co.* v. *Lowdermilk,* 15 Ind. 120; *The Toledo and Wabash R. R. Co.* v. *Thomas,* 18 Ind. 215; *Smith* v. *Smith,* 2 Pick. 621; *Brooks* v. *The Buffalo, &c., R. R. Co.,* 25 Barb. 600; *Suydam* v. *The Street Railway Co.,* 41 Barb. 375; *Runyen* v. *The Central R. R. Co.,* 1 Dutcher 558; *Dascomb* v. *The Erie R. R. Co.,* 27 Barb. 221; *Mackey* v. *The New York Central R. R. Co.,* 27 Barb. 528; *Button, Adm'x,* v. *The Hudson River R. R. Co.,* 18 N. Y. 248; *Brown* v. *Maxwell,* 6 Hill 592; *The Cleveland, &c., R. R. Co.,* v. *Ferry,* 8 Ohio 570: *Clark* v. *Kirwin,*

4 E. D. Smith's R. 21; *Owen v. The Hudson River R. R. Co.*, 2 Bosworth 374; *Murch v. The Concord R. R. Co.*, 9 Foster 9; *Moore v. The Central R. R. Co.* 4 Zabrisky, 268. 828.

Upon the supposition, then, that the railroad company, or its employees, were guilty of negligence, and that such negligence contributed to the collision, the question recurs, was *Gilpin*, the agent of the plaintiff, free from fault, or was he also negligent, and did that negligence also contribute to the injury?

We have already referred to the evidence on this point. The jury returned an affirmative answer to the following interrogatory, submitted by the plaintiff, viz: "Was not *Gilpin*, the driver of the plaintiff's team, giving proper attention to the passing trains at the time the collision occurred?" The interrogatory is indefinite in the fact that the word "trains" is used, while the gravel train was the only one on the defendant's road that was passing or approaching the crossing. A train or locomotive on the *Pittsburgh* road had just crossed the plank road in front of the team, to which, as we have seen, *Gilpin* was paying attention; but, upon the presumption that the interrogatory also referred to the gravel train, with which the wagon collided, and was so understood by the jury, it will be observed that it refers to no particular fact, but leaves it entirely to the jury to determine what constituted proper attention, under the circumstances. If *Gilpin* saw the train approaching and was giving attention to it, he should at once have stopped the team, and if he saw it in time to have done so, and still rushed upon it, the act was not merely negligence but extreme recklessness. But perhaps the answers to certain interrogatories submitted by the defendant may serve, in some degree, to explain what, in the opinion of the jury, constituted "proper attention." The interrogatories are as follows: "Did *Gilpin*, the driver of *Goddard's* team, stop before crossing defendant's track, or look for or listen for a passing train?" Answer, "No."

"Did *Gilpin* use any precaution to ascertain whether

there was any train approaching?" Answer, "Yes, all in his power—driving moderate—the wood shed and box car standing in between him and the gravel train considered."

*Gerrard* and *Robuck* both testify that the horses were being driven in a moderate or slow trot, which *Gerrard* explained to be at the rate of six miles an hour. These witnesses were both in the wagon, and *Robuck*, testifies that he saw the train coming and thought there would be a collision. From the answers to these interrogatories, it is evident that "driving moderate," that is in a slow trot, at the rate of six miles an hour, constituted, in the opinion of the jury, giving "proper attention to the passing trains," and was all the precaution *Gilpin* could use, under the circumstances, to ascertain whether there was any train approaching.

The evidence clearly indicates that *Gilpin*, after passing the locomotive on the *Pittsburgh* track, drove forward at an unwarrantable speed, without listening, looking or halting, or attempting to do so, until he came in collision with the train. He was familiar with the crossing, had passed over it almost daily for months, and knew, or might and should have known, the time that regular trains on the road were due at that point, and, under the circumstances, if a view of the track was obstructed by the wood shed, and the noise of the locomotive behind him prevented him from hearing the whistle or bell of the approaching train, common prudence should have dictated to him to approach the track slowly, and not venture upon it until he had ascertained that no train was approaching. Failing in this, the collision occurred. The injury was the result of his own negligence, and the plaintiff has no cause to complain of the railroad company.

The case of *Mackey* v. *The New York Central R. R. Co.*, 27 Barb. 528, was very similar to the case at bar, except in its fatal consequences. There, as here, a wood house and several piles of wood stood near the track, obstructing the view of persons approaching on the highway. *Mackey,*

lived near, was familiar with the locality, and had helped to haul and pile the wood in the shed. At the time of the accident, twenty-four trains passed the station daily. *Mackey* attempted to cross the track about the time a train was due, was struck and killed. The suit was brought by his wife, as administratrix. Judgment in the lower court for $3,000.

In reversing the judgment, the court say: "The wood was piled all along for many rods so as to obstruct the view. In what respect this imposed any extra duty on the defendant, I cannot conceive. The deceased was not a stranger there. He had been engaged in hauling and piling the wood at the station the whole of the last season. He knew, or should have known, the number of trains run and the time of running, &c. It was the height of imprudence, with such knowledge, to attempt to cross the track when a train was due till he had fully ascertained that it was safe to do so. The situation of the wood pile did not diminish the degree of care required of him in the slightest degree— rather did it increase his duty to a greater carefulness. He was bound to exercise care, diligence and foresight in proportion to the danger to be avoided, and the fatal consequences involved in his neglect."

In *Runyen* v. *The Central R. R. Co.*, 1 Dutcher 558, it is said that, "The necessities of railroad travel demand a speed at which it is impossible to prevent a collision, if persons traveling on the highway rush carelessly or recklessly upon a crossing, ahead of an approaching train. Every collision of the kind places not only the party traveling on the highway, but the passengers in the train of cars in iminent peril, many times occasioning great loss of life. Every precaution should be used by persons driving teams, &c., to guard against coming in contact. The proper signals should always be given from a locomotive on approaching the crossing, and the omission of this caution should be punished. But, besides this, persons approaching a crossing in their own vehicles must use their eyes and ears, and

exercise common care and prudence to avoid a collision, and the care must be commensurate with the danger, or they are no less responsible."

These rules, we think, are sound ones and applicable to the case at bar.

The judgment of the court below is in all things reversed, with costs, and the cause remanded for a new trial.

*W. Z. Stuart,* for appellant.

*M. Jenkinson* and *D. P. Wheedon,* for appellee.